## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ALICE ANDERSON, <u>et al.</u>,        )
                                      )
        Plaintiffs,                   )
                                      )
    v.                                )        Civil Action No. 04-56 (GK)
                                      )
CHARLES RAMSEY, <u>et al.</u>,        )
                                      )
        Defendants.                   )
──────────────────────────────────────)

### <u>MEMORANDUM OPINION</u>

Plaintiffs are three current and former employees of the District of Columbia Metropolitan Police Department ("MPD").[1]  Defendants are Charles Ramsey, Chief of Police for the District of Columbia; Shannon Cockett, Assistant Chief of Police for the District of Columbia; Nola Joyce, Senior Executive Director of the MPD Human Services Department; Ira Grossman, formerly an MPD Inspector and Director of its Public Safety Communications Center ("PSCC"); and the District of Columbia.[2]

Plaintiffs, all of whom served as PSCC call takers or supervisors and were terminated between August 2003 and December 2004, allege, <u>inter alia</u>, various constitutional deprivations in violation of 42 U.S.C. § 1983; employment discrimination in violation of 42 U.S.C. §

─────────────────────

[1]  The individual Plaintiffs include one civilian, Betty Bibb, and two current or former MPD officers, Curtis Adamson and Jennette Miller.  The parties have informed the Magistrate Judge assigned to this case that five of the eight Plaintiffs named in the Amended Complaint have settled their claims: Alice Anderson, Jeri Butler, Gwendolyn Carey, Delphine Fennell, and Justine Tolson.

[2]  With the exception of Ira Grossman, who was terminated from the MPD and has retained separate counsel, all Defendants are presenting a coordinated defense.  Accordingly, all Defendants except Grossman are referred to herein as the "District Defendants."

1981; unlawful retaliation under the District of Columbia Whistleblower Protection Act, D.C. CODE §§ 1-615.51 et seq. ("WPA"); and intentional infliction of emotional distress.

This matter is currently before the Court on Defendant Grossman's Motion to Dismiss or, in the Alternative, for Summary Judgment [Dkt. No. 43] and the District Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment [Dkt. No. 44]. Upon consideration of the Motions, Opposition, Replies, and the entire record herein, and for the reasons stated below, Defendant Grossman's Motion is hereby **granted** and the District Defendants' Motion is hereby **granted in part and denied in part.**

## I.    BACKGROUND

### A.    Facts[3]

#### 1.    The Events of January 15, 2003, the Public Response, and the Ensuing Investigation

On the morning of January 15, 2003, between 5:00 and 6:00 a.m., a fire broke out at 1617 21st Street, N.W., Washington, D.C., a townhouse located near DuPont Circle. A twenty-four year old man who lived inside the house was badly burned and died several days later. While the parties vigorously dispute most of what happened next, there is no disagreement that Plaintiffs were call takers or supervisors on duty

---

[3]    Pursuant to Local Civil Rule 7(h), "[i]n determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." Accordingly, unless otherwise noted, the facts recited herein are taken from parties' Statements of Material Facts Not in Dispute.

that morning at the PSCC, an MPD-operated facility that takes all 911 emergency calls placed in the District of Columbia and then contacts the appropriate police, fire, or emergency medical services dispatcher. There is also no dispute that some 911 calls regarding the fire were placed on hold, apparently during a seven-minute period beginning at 5:58 a.m. and ending at 6:05 a.m.  How long any particular caller was placed on hold is a matter of fierce dispute, but the MPD investigator who looked at the matter most closely found that the longest wait time likely lasted one minute and eleven seconds.  See Pls.' Ex. 21A, Mar. 3, 2003 Memorandum from Ira Grossman to Charles Ramsey.

Criticism of the PSCC's handling of the fire began almost immediately.  On January 16, 2003, District of Columbia Councilmember Phil Mendelson reported hearing that a neighbor "called 911 – as flames licked at his house and glass windows were blown out – and it took three calls to get through."  See Pls.' Ex. 20, Attachment 1, Jan. 16, 2003 Memorandum (emphasis in original).  Councilmember Mendelson demanded an accounting of the number of personnel on duty when the fire occurred, the number of "abandoned," or dropped, calls during that shift and in the previous week, and the average pickup, talk, and "wrap-up" times for incoming calls at the PSCC.  Id.  Soon thereafter, the Washington Post and other local news outlets began running stories about the fire and the PSCC's response to it.  See, e.g., David A. Farenthold and Arthur Santana, One Operator On Call Day of Fatal Fire: D.C. Officials Vow Probe of 911 System Problems, Wash. Post, Feb. 12, 2003 at B01; David A. Farenthold, Four Operators Weren't Taking Calls

During Fire: Ramsey Vows to Find Out Reason, Wash. Post, Feb. 22, 2003 at B02.  As allegations of excessive hold times and abandoned calls continued to emerge, criticism of the PSCC, and Chief Ramsey, increased.  See David A. Farenthold, Ramsey Grilled On 911 Failures: D.C. Council Left Puzzled, Wash. Post, Feb. 26, 2003 at B03.

In late 2003, Defendant Grossman, who at the time was Director of the PSCC, began an investigation into the PSCC's performance during the night of the DuPont Circle fire.  As part of that investigation, Grossman interviewed each Plaintiff and attempted to construct a minute-by-minute log of their activities during that night.  On March 3, 2003, he issued a report.  See Pls.' Exs. 20, 21.  He concluded, inter alia, that each Plaintiff had been "inactive," meaning that their telephone headsets were unplugged or they were away from their workstations, for excessive periods of time that night, including in the critical minutes when reports of the fire began coming in.[4]  See Pls.' Ex. 21A.  While Grossman did not suggest that Plaintiffs' alleged inactivity caused, or even contributed to, the fatality that occurred, he described their performance as "inexcusable" and recommended that each be cited each for "adverse action."  Id.

---

[4] Plaintiffs dispute the accuracy of Grossman's investigation and report, which they describe as a "sham," and attack the data on which it is based, especially the computer systems that track their activity while on duty.  See Pls.' Opp'n at 9-17.  To the extent that they may have been "inactive" during the shift, a term that they contend is misleading, Plaintiffs allege that they were performing work-related duties.  Id. at 4-8.

On March 6, 2003, after reviewing Grossman's report, Chief Ramsey announced that he intended to fire all Plaintiffs.  See David A. Farenthold, Ramsey Plans to Fire 7 Over Delayed 911 Calls, Wash. Post, Mar. 7, 2003 at A01.  That same day, Councilmember Mendelson sent a letter to Mayor Anthony Williams, requesting that any new employment contract for Chief Ramsey—whose initial term of employment was set to expire in April 2003—be submitted to the D.C. Council for approval. Id.

### 2.   Disciplinary Actions Taken Against Plaintiffs

Grossman's March 3, 2003 recommendation that each Plaintiff be cited for adverse action went up the chain of command and set in motion disciplinary procedures that would result in the termination of every Plaintiff except Jennette Miller, who was instead suspended for thirty days.  Stephen Gaffigan, who as Director of MPD Corporate Support was Grossman's immediate supervisor, received the recommendations first and then forwarded them to Diana Haines-Walton, Acting Director of Human Services.  See Pls.' Opp'n at 23.  What happened next differed as to each Plaintiff.[5]

### a.   Betty Bibb

Bibb began working for MPD in April 1997 and was on duty as a call taker during the January 15, 2003 overnight shift.  Although she contends that she was "at her console ready to take calls at the time of the fire," and was in fact "the first call taker to accurately

---

[5] It should be noted that, as a general matter, the governing collective bargaining agreements specify different disciplinary procedures for civilian employees and MPD officers.

report the fire to the [Fire Department] dispatcher," Pls.' Opp'n at 5, Grossman found that she was inactive "during the critical time when five (5) calls for the fire were received," and that "of the seven hours [she] should have been taking calls . . . she was available for six hours and eight minutes."  Pls.' Ex. 21A at 6.  On that basis, Grossman concluded that she should be suspended without pay for fifteen days.  Id.  Upon reviewing Grossman's recommendation, Director Gaffigan wrote a March 5, 2003 Memorandum to Haines-Walton, stating that because of Bibb's "egregious and grossly negligent conduct," her penalty should instead be termination.  Pls.' Ex. 29.

Pursuant to MPD discipline procedures for civilian personnel, Haines-Walton appointed a Hearing Officer to consider the evidence against Bibb and make an independent disciplinary recommendation.  On May 6, 2003, the Hearing Officer, Mary Ann Rodgers, explained in a Memorandum to Haines-Walton that she believed the evidence against Bibb was insufficient to sustain the proposed penalty of termination. See Pls.' Ex. 34.

The final disciplinary decision for any civilian MPD employee is made by a "Deciding Official," and Haines-Walton appointed Defendant Nola Joyce to serve in that capacity in Bibb's case.  After reviewing the recommendations of Grossman, Gaffigan, and Rodgers,  Joyce drafted a letter to Bibb, informing her that she would be suspended for 30 days as a result of her conduct on January 15, 2003.  See Pls.' Ex. 53. Defendant Shannon Cockett, Assistant Chief of Police, received that draft letter and forwarded it to Chief Ramsey on June 30, 2003 for his

"review and approval." Id. According to Plaintiffs, neither Cockett nor Ramsey should have been involved at this stage of the process. See Pls.' Opp'n at 46-47. Nevertheless, at some point after receiving Joyce's draft letter, Ramsey spoke to Joyce about the sanction she had proposed for Bibb. See Pls.' Ex. 46. Subsequently, Joyce drafted a revised letter to Bibb, informing her that she would be terminated. On July 21, 2003, Cockett forwarded this revised letter to Ramsey. Pls.' Ex. 54. Bibb was notified of her termination on July 24, 2003 and it became effective on August 8, 2003. See Pls.' Ex. 56.

Bibb appealed her termination through the arbitration procedure set forth in the collective bargaining agreement governing civilian employees. On May 21, 2004, the arbitrator determined that MPD had not carried its burden of proving that Bibb "was doing something improper and/or not work related when she was not actually handling a call" on the night in question, in part because the computer systems tracking PSCC activities were not "absolutely reliable." Pls.' Ex. 9 at 28. On that basis, the arbitrator ordered Bibb reinstated with back pay. Id. at 29.

### b.   Curtis Adamson

Curtis Adamson joined the MPD as an officer in 1982 and was promoted to the rank of Sergeant in 1988. From 1995 forward he served as a supervisor in the PSCC and was on duty during the midnight shift of January 15, 2003. See Pls.' Opp'n at 4. Adamson claims that during much of the night in question, he was in the supervisors' room, performing his usual duties, but that he moved to the call center as

soon as he learned a fire had been reported and began taking calls himself some time around 6:00 a.m.

As an MPD officer, Adamson was subject to disciplinary procedures that differed from those applied to the civilian Plaintiffs.  As the first step in this process, Haines-Walton sent him a Notice of Proposed Adverse Action on April 28, 2003, notifying him that "the department proposed to terminate your employment" for "derelictions" that occurred on January 15, 2003.  District Defs.' Ex. 3.  Pursuant to MPD General Order 1202.1, an "Adverse Action Panel" was convened to consider the charges against Adamson and the proposed punishment.[6]  See Pls.' Ex. 43. In an undated document that appears to have been issued in late August or September 2002, the Panel found that Adamson had neglected certain duties but that a seventy-day suspension, rather than termination, was the appropriate punishment.  See Pls.' Ex. 43.

After receiving the Panel's recommendation, Defendant Cockett forwarded it to Chief Ramsey for his review.  See Pls.' Ex. 48, Cockett Dep.  She then drafted a Memorandum to Adamson notifying him that,

---

[6]  MPD General Order 1202, which sets forth the disciplinary procedures for officers, requires that an Adverse Action Panel composed of three impartial officers of the rank of Captain or above convene in any case where termination is proposed.  The Panel is authorized to conduct a hearing and "write findings of fact and conclusions of law with recommendations to the Administrative Services Officer outlining their opinion on the matter."  MPD General Order 1202(G)(3)(b)(3).  Throughout the parties' briefs, and in General Order 1202, Adverse Action Panels are also identified as "Trial Boards."  Because the term "Trial Board" refers to a longstanding procedure for disciplining MPD officers that was superceded by statute in 1979, and that differs substantively from the procedure currently in place, the Court will use the terms "Adverse Action Panel" or "Panel" exclusively.  See D.C. Code §§ 5-127.01, 1-636.02.

consistent with the Adverse Action Panel's recommendation, he would be suspended for seventy days.  See Pls.' Ex. 64.  That Memorandum was never sent, however.  Instead, by a revised Memorandum dated January 14, 2004, Cockett informed Adamson that the punishment indicated in his Notice of Proposed Adverse Action would be imposed and that February 20, 2004 would be his last day on the force.  See Pls.' Ex. 65.

Prior to receiving the Memorandum, but apparently after the decision was made to terminate him, Adamson sent a letter to Cockett, dated December 23, 2004, in which he stated that he had "attempted to make contact with the news media to expose the corruption in this investigation" and that he believed MPD was considering terminating him "to intimidate [him] and keep [him] from speaking the truth."  Pls.' Ex. 74.

Adamson has appealed his termination and his case is currently pending before the District of Columbia Office of Employee Appeals. See Pls.' Opp'n at 53.

### c.   Jennette Miller

An MPD officer since 1982, Jennette Miller was elevated to the rank of Sergeant in 1994, was assigned to the PSCC in 1995, and was the roll call officer for the January 15, 2003 overnight shift.  See Pls.' Opp'n at 7.  As the roll call officer, she reported one hour early, at 11:00 p.m., for the midnight shift, and was therefore permitted to leave one hour early.  Id.  Accordingly, Miller left the PSCC at 5:45 a.m. on January 15, 2003, approximately thirteen minutes before the first 911 call reporting the DuPont Circle fire.  Id.

On April 4, 2003, Miller received a Notice of Proposed Adverse Action from Cockett indicating that the proposed penalty in her case was a thirty-day suspension.  See Pls.' Ex. 68.  On April 22, 2003, Miller responded with a detailed Memorandum describing her activities throughout the shift and specifically disputing an assertion in Grossman's report that she stayed on duty until 6:00 a.m.[7]  Because termination was not recommended in Miller's case, it was not necessary for an Adverse Action Panel to be convened. Instead, by Memorandum dated September 8, 2003, Cockett notified her that she would be suspended for thirty days, consistent with the Notice of Proposed Adverse Action.  See Pls.' Ex. 68.

### 3. Plaintiffs' Public Criticism of MPD, the PSCC, and Chief Ramsey

Before the fatal fire occurred, Plaintiffs allege that they had repeatedly complained to their supervisors about "technical systemic failures in the PSCC telecommunication hardware and software."  See Pls.' Opp'n at 18-21.  Plaintiffs further allege that "upon hearing rumors that they might be blamed for the DuPont Circle fire," they began to "speak out" to the media about the larger problems at the PSCC.  Id. at 21.

In May 2003, Anderson and Bibb gave interviews to David Farenthold, a Washington Post reporter, during which they allegedly

---

[7]   It would later emerge that Grossman had falsified a statement from Miller in an attempt to establish that she was at the PSCC when the fire calls came in.  See Pls.' Ex. 23, Ramsey Dep. at 188-89.  Grossman was terminated as a result of this action.  Id.

described widespread problems at the PSCC and criticized high-ranking MPD officials, especially Chief Ramsey.  See Pls.' Opp'n at 30-31.  The story that resulted from these interviews, however, does not contain any quotes from Bibb or Anderson making such allegations.  See David A. Farenthold, D.C. Findings Undermine Case Against 911 Operators, Wash. Post, May 14, 2003 at B01.  On July 31, 2003, Plaintiffs held a press conference during which they "repeated to the media the complaints they previously had raised internally about the defects in the PSCC computer systems."  Pls.' Opp'n at 22.  Finally, some time in September 2003, Bibb, along with former Plaintiffs Carey and Fennell, participated in a local radio call-in show during which they accused Chief Ramsey of trying to use them as scapegoats in order to cover up longstanding problems at the PSCC.  Id. at 22-23.

### B.  Procedural History

Plaintiffs brought this action on January 14, 2004 and amended their Complaint on January 28, 2004.  They present several claims. First, they allege that Defendants conspired to deprive them of their civil rights in violation of 42 U.S.C. § 1983 ("Section 1983") as well as the First and Fifth Amendments.  Am. Compl. ¶ 54.  Second, they contend that Defendants violated Section 1983 by terminating their employment with "deliberate indifference" to their Fifth Amendment rights to due process and equal protection.  Id. ¶¶ 72-73.  Third, they argue that Defendants are liable pursuant to 42 U.S.C. § 1981 ("Section 1981") for employment discrimination on the basis of race.  Id. ¶ 76. Fourth, Plaintiffs contend that Defendants retaliated against them for

exercising their First Amendment right to free speech, in further violation of Section 1983. Id. ¶ 79. Fifth, they allege that Defendants violated the District of Columbia Whistleblower Protection Act ("WPA"), D.C. Code §§ 1-615.51 et seq., by terminating them in retaliation for making protected disclosures about PSCC operations. Id. 81. Sixth, and finally, Plaintiffs maintain that Defendants are liable for intentional infliction of emotional distress. Id. ¶¶ 84-87.

On September 26, 2005, the parties filed a Stipulation of Dismissal, dropping several counts against Defendant Grossman. See Dkt. No. 42. Specifically, Plaintiffs dismissed their claims alleging constitutional violations, violations of Section 1981 and 1983, and intentional infliction of emotional distress. Id. Consequently, they are currently maintaining only one claim against Grossman: civil conspiracy.[8]

Defendants' respective Motions to Dismiss or, in the Alternative, for Summary Judgment were also filed on September 26, 2005. Plaintiffs submitted a combined Opposition on November 3, 2005, and Defendants filed Replies on December 13, 2005.

---

[8]     The September 26, 2005 Stipulation misidentifies the intentional infliction of emotional distress claim, which it purports to dismiss as to Grossman, as "Count V," when the Amended Complaint lists that claim as Count VI. Further, it simply does not address what is actually Count V in the Amended Complaint: the WPA claim.

At a Pre-Trial Conference held on December 13, 2005, the parties represented that only the civil conspiracy claim remains against Grossman and therefore the Court will assume that notwithstanding the parties' failure to mention it in the Stipulation, Plaintiffs are not maintaining the WPA claim against Grossman.

## II.   STANDARD OF REVIEW

Defendants move to dismiss the Complaint or, in the alternative, for summary judgment.  Where, as here, the Court must consider "matters outside the pleading" to reach its conclusion, a Motion to Dismiss "must be treated as one for summary judgment and disposed of as provided in Rule 56."  See Fed. R. Civ. P. 12(b); see also Yates v. District of Columbia, 324 F.3d 724, 725 (D.C. Cir. 2003) (noting that when a judge considers matters outside the pleadings, a motion to dismiss under Rule 12(b)(6) must be converted into a Motion for Summary Judgment under Rule 56).

Summary judgment should be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits or declarations, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56. Material facts are those that "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The nonmoving party then must "go beyond the pleadings and by [its] own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  Id. at 324.  See Laningham v. U.S. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987) (nonmoving party has affirmative duty to provide

enough evidence that a "reasonable jury could return a verdict" in its favor); see also Bias v. Advantage Intern., Inc., 905 F.2d 1558, 1561 (D.C. Cir. 1990) ("The nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts . . . [it] must come forward with 'specific facts showing that there is a genuine issue for trial.'" (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986))).

In deciding a motion for summary judgment, a "court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); see also Washington Post Co. v. U.S. Dep't of Health and Human Servs., 865 F.2d 320, 325 (D.C. Cir. 1989). Ultimately, a court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52. "If material facts are susceptible to divergent inferences, summary judgment is not available." Coward v. ADT Sec. Sys. Inc., 194 F.3d 155, 158 (D.C. Cir. 1999).

## III. ANALYSIS

### A. Summary Judgment Must Be Entered for Defendants on Plaintiffs' Civil Conspiracy Claim

All Defendants argue that Plaintiffs' civil conspiracy claim fails as a matter of law because the District of Columbia and its employees

constitute a single legal entity.[9]  See District Defs.' Mot. for Summ.

J. (hereinafter "District Defs.' Mot.") at 7; Grossman's Mot. for Summ.

J. (hereinafter "Grossman's Mot.") at 7.  By definition, they argue, a

conspiracy involves "a combination of two or [more] persons acting in

concert to commit an unlawful act or a lawful act by unlawful means,"

and therefore a single entity cannot conspire with itself.  District

Defs.' Mot. at 7.

In the District of Columbia, a civil conspiracy "requires: an

agreement to do an unlawful act or a lawful act in an unlawful manner;

an overt act in furtherance of the agreement by someone participating

in it; and injury caused by the act."  Halberstam v. Welch, 705 F.2d

472, 487 (D.C. Cir. 1983).  When municipal employees take action under

the authority of the municipality, however, the ensuing "conduct . . .

is essentially a single act by a single entity."  Gladden v. Barry, 558

F. Supp. 676, 679 (D.D.C. 1983); see generally Okusami v. Psychiatric

Inst. of Washington, Inc., 959 F. 2d 1062, 1066-67 (D.C. Cir. 1992)

(explaining that under the intracorporate conspiracy doctrine, a

corporation and its officers constitute a single legal entity).

Accordingly, no conspiracy can exist when the alleged co-

conspirators are a corporate entity, whether private or municipal, and

---

[9]  The Defendants also argue that the Amended Complaint does
not allege specific facts suggesting a conspiracy and, therefore,
fails the heightened pleading requirements for Section 1983
conspiracy claims.  See District Defs.' Mot. at 10-13; Grossman's
Mot. at 10.  While this argument appears to have merit, the Court
is satisfied that even assuming Plaintiffs properly stated a
conspiracy claim, such a claim cannot succeed under the governing
law.  Accordingly, there is no need to discuss the facial
sufficiency of Plaintiff's pleadings.

its employees are acting within the scope of their ordinary responsibilities.  See Michelin v. Jenkins, 704 F. Supp. 1, 4 (D.D.C. 1989) ("[T]here can be no conspiracy between the District of Columbia Board of Education and its officials to violate plaintiff's rights, since these defendants comprise a single entity, not capable of entering into a conspiracy.").

Plaintiffs do not contend that Defendants acted outside the scope of their employment.[10]  Nor do they offer any other rationale under which the Court could find a civil conspiracy here.  Because all Defendants' actions were taken under the authority, and in the name, of the District of Columbia, and because a municipality and its employees cannot conspire with each other, both the District Defendants and Grossman are entitled to summary judgment on Plaintiffs' civil conspiracy claim.

**B.   Defendants Are Entitled to Summary Judgment on Plaintiffs' Intentional Infliction of Emotional Distress Claim**

Defendants argue that no matter how unjust their actions may have seemed, Plaintiffs cannot succeed on their intentional infliction of emotional distress claim unless they establish that Defendants' conduct was "beyond all bounds of decency . . . and utterly intolerable in a civilized society."  District Defs.' Mot. at 30.  According to Defendants, Plaintiffs simply cannot carry such a burden.

---

[10]   In fact, Plaintiffs fail to address Defendants' civil conspiracy arguments at all.  Their lack of opposition is itself grounds for the Court to enter summary judgment for Defendants on this claim.  See U.S. District Court for the District of Columbia Local Rule LcvR 7(b).

District of Columbia law requires plaintiffs alleging intentional infliction of emotional distress to establish three elements: "(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." Sturdza v. United Arab Emirates, 281 F.3d 1287, 1305 (D.C. Cir. 2002) (quoting Howard Univ. v. Best, 484 A.2d 958, 985 (D.C. 1984)). Conduct that is "extreme and outrageous" is not merely offensive or harmful; it must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Sere v. Group Hospitalization, Inc., 443 A.2d 33, 37 (D.C. 1982) (quoting Restatement (Second) of Torts § 46 cmt. (1965)).

Perhaps recognizing the often bitter quality of employee-employer disputes, courts in this jurisdiction are especially skeptical of intentional infliction of emotional distress claims in employment cases. See Kerrigan v. Britches of Georgetowne, Inc., 705 A.2d 624, 628 (D.C. 1997) (noting that "in the employment context, we traditionally have been demanding in the proof required to support an intentional infliction of emotional distress claim" and that "employer-employee conflicts" do not generally "rise to the level of outrageous conduct"). Notably for present purposes, "discharge of an employee is not 'conduct that goes beyond all possible bounds of decency and [is] regarded as atrocious and utterly intolerable in a civilized community.'" Crowley v. North Am. Telcoms. Ass'n, 691 A.2d 1169, 1172 (D.C. 1997) (internal quotation omitted).

Based on the heightened standard applicable in employment cases, Plaintiffs' intentional infliction of emotional distress claim must fail as a matter of law.  Even accepting their allegations as true in their entirety, this is at bottom an employer-employee dispute. Whatever questions Plaintiffs may have about the disciplinary procedures employed, the evidence used against them, or the role of individuals like Ramsey and Cockett, it simply cannot be said that Defendants' behavior was "beyond all bounds of decency" and "intolerable in a civilized society."

Indeed, on facts similar to these, the District of Columbia Court of Appeals found that an employee's intentional infliction of emotional distress claim could not proceed.  In Kerrigan, the plaintiff claimed that his employer unfairly targeted him for a sexual harassment investigation, manufactured evidence against him, leaked information about the investigation to discredit him, and demoted him without just cause.  Kerrigan, 705 A.2d at 628.  Nevertheless, the court found that even if plaintiff's allegations were true, his employer's actions could not constitute "extreme and outrageous conduct" as a matter of law.[11] Id.  Plaintiffs' allegations against MPD are virtually identical to those Kerrigan lodged against his employer.  Because such allegations could not support a claim of intentional infliction of emotional distress in that case, they cannot here either.

---

[11]  Notwithstanding Defendants' reliance on Kerrigan in their opening briefs, and the clear factual similarities between that case and this one, Plaintiffs make no attempt to distinguish Kerrigan.

For the foregoing reasons, summary judgment must be entered in Defendants' favor on the intentional infliction of emotional distress claim.

**C.    Summary Judgment Must Be Entered for Defendants on Plaintiffs' Due Process Claim**

In disciplining them for the events of January 15, 2003, Plaintiffs claim that Defendants violated their Fifth Amendment right to substantive due process through "arbitrary and irrational abuse of their powers. . . that . . . truly shocks the conscience." Pls.' Opp'n at 71. In response, the District Defendants argue that because "only the most egregious government conduct" violates substantive due process, Plaintiffs have alleged no facts that could meet the applicable legal standard.  District Defs.' Reply at 8.  Accordingly, they move for summary judgment on the due process claim.

Substantive due process, as opposed to its procedural counterpart, protects individuals against "certain government actions, regardless of the fairness of the procedures used to implement them." Daniels v. Williams, 474 U.S. 327, 331 (1986).  A narrow concept that the Supreme Court has "always been reluctant to expand," Collins v. Harker Heights, 503 U.S. 115, 125 (1992) substantive due process has been invoked to invalidate "only the most egregious official conduct." County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998).  Accordingly, the Court has described "the cognizable level of executive abuse of power as that which shocks the conscience." Id.; see also Collins, 523 U.S. at 128

(government action violates substantive due process only if it is "arbitrary or conscience-shocking in the constitutional sense").

Where, as here, a plaintiff seeks damages under Section 1983 for an alleged substantive due process violation, he must

> at least show that state officials are guilty of grave unfairness in the discharge of their legal responsibilities. Only a substantial infringement of state law prompted by personal or group animus, or a deliberate flouting of the law that trammels significant personal or property rights qualifies for relief.

Silverman v. Barry, 845 F.2d 1072, 1080 (D.C. Cir. 1988).  To recover, the plaintiff must show "purposeful, malicious action" on the part of the government officials in question.  Id. (quoting Ortega Cabrera v. Municipality of Bayamon, 562 F.2d 91, 103 (1st Cir. 1977)).

Applying these principles to the facts of this case, the Court must conclude that the District Defendants are entitled to summary judgment on the substantive due process claim.  Plaintiffs' due process claim centers on three allegations: first, that Defendants used improper procedures to adjudicate their disputes; second, that Defendants imposed sanctions without any evidentiary support; and, third, that "personal motives" led Defendants, particularly Chief Ramsey, to take disciplinary actions against them.  See Pls.' Opp'n at 72 - 85.  Even giving Plaintiffs the benefit of every reasonable inference, none of these allegations can support their substantive due process claim.

The argument that the District Defendants adjudicated Plaintiffs' claims using the wrong procedures is simply unfounded.  According to Plaintiffs, pursuant to D.C. CODE § 5-127.01, MPD officers such as Adamson are entitled to appear before a "trial board," the finding of

which is final unless  appealed to the Chief of Police and overturned. Id. at 78 (citing D.C. CODE § 5-133.06).   Because Adamson's case was heard by an Adverse Action Panel, rather than a trial board, Plaintiffs claim that Defendants processed it incorrectly.   As the District Defendants correctly point out, however, the provisions Plaintiffs cite were superceded in 1979 and do not apply to any MPD officer hired after January 1, 1980.   See D.C. CODE § 1-632.   Instead, MPD General Order 1202 governs discipline of MPD officers hired after that date, including Plaintiffs Adamson and Miller.   Plaintiffs cannot reasonably claim that MPD's handling of their cases violated General Order 1202.[12]   As a result, their argument that Defendants adjudicated their cases improperly must be rejected.

Plaintiffs' claim that Defendants disciplined them "without supporting facts" is also flawed.   See Pls.' Opp'n at 72.   It is beyond dispute that Grossman's investigation relied on imperfect data.   It is also clear that there is no evidence of a causal connection between

_____

[12]   Improperly relying on D.C. CODE § 6-133.06, Plaintiffs argue that "only the trial board, not Defendants Cockett or Ramsey, had the right to make the final decision" as to their punishment. By its clear terms, however, General Order 1202 empowers the "Administrative Services Officer," in this case Cockett, to receive a recommendation from the Adverse Action Panel and either to "remand the case . . . or issue a final notice of adverse action (decision) affirming, reducing[,] or setting aside the action, as originally proposed in the notice of proposed adverse action."  MPD General Order 1202(G)(b)(3).   In Adamson's case, the only one to proceed through the Adverse Action Panel Process, Cockett received the Panel's recommendation of a seventy-day suspension but decided instead to affirm the sanction that had been laid out in the Notice of Proposed Adverse Action – termination.   Notwithstanding Plaintiffs' allegations, there can be no doubt that Cockett was clearly within her rights to do so pursuant to General Order 1202(G)(b)(3).

Plaintiffs' performance and the death that occurred in the DuPont Circle fire. See id. at 73-76. These gaps in the evidentiary record, however, do not compel the conclusion that MPD "had no evidence" for disciplining Plaintiffs.[13] On the contrary, in Adamson's and Bibb's cases, in which termination was proposed, MPD presented substantial evidence against each Plaintiff to impartial decisionmakers and afforded them meaningful opportunities to respond.[14] Even Plaintiff Miller, who faced a thirty-day suspension rather than termination, was informed of the evidence against her and answered the charges against her. See Pls.' Ex. 17. In every case, Plaintiffs' objections to the evidence against them were fully aired and seem to have been duly considered.

Given the exceedingly high standard required to show a substantive due process violation, Plaintiffs cannot maintain such a claim on these facts. Whatever questions they may have about the evidence against them, and however vigorously they disagree with the sanctions imposed, they cannot establish that MPD officials "are guilty of grave unfairness." Silverman, 845 F.2d at 1080. Plaintiffs' cases have been

_____

[13] In fact, Plaintiffs concede certain facts that MPD included in its case against them: that a man died during the course of the DuPont Circle fire, that there was a public outcry over the events of January 15, 2003, and that the supervisors on duty at the PSCC could not see the activities taking place in the call center from their workstations.

[14] Because he was an MPD officer, Chief Ramsey used a different procedure to discipline Adamson from that used in Bibb's case. Nevertheless, a neutral decisionmaker reviewed MPD's charges and evidence in each case, and both Plaintiffs had an opportunity to respond. Both had the benefit of at least one level of appellate review. As noted supra, Bibb was ultimately reinstated by an arbitrator and Adamson is currently awaiting a decision from the D.C. Office of Employee Appeals.

winding their way through the administrative review process for over two years now.  During that time, they have had numerous opportunities to challenge the evidence against them and at least one Plaintiff was ultimately vindicated on appeal.  It simply cannot be said that any harm they have suffered resulted from "arbitrary, conscience-shocking" actions.  <u>Collins</u>, 523 U.S. at 128.

For similar reasons, Plaintiffs' allegation that Chief Ramsey acted from personal motives must also be rejected.  They are correct that following the January 15, 2003 death, revelations of problems at the PSCC brought tremendous public pressure on him and that the D.C. Council mentioned those problems in a hearing about the renewal of his employment contract.  <u>See</u> Pls.' Opp'n at 18.  They are also correct that Chief Ramsey made clear as early as March 6, 2003 that he intended to fire the call takers on duty and that he had conversations with Defendants Joyce and Cockett to that effect.  Beyond pure speculation, however, Plaintiffs have offered no evidence of any kind indicating that Ramsey entertained personal animus against them or that such hostility outweighed any legitimate motivations underlying the Chief's actions.

Again, however questionable Chief Ramsey's actions may have been—and it is not the Court's role to make a finding as to their propriety—the record is simply insufficient to establish that he exercised his powers arbitrarily, or that he deliberately flouted the law.  <u>Silverman</u>, 845 F.2d at 1080.  Plaintiffs' disagreement with the role Ramsey played in their cases, and the decisions he made, cannot, by themselves, bear the weight of their heavy burden to prove that he

acted "without any reasonable justification in the service of a legitimate governmental objective," Lewis, 523 U.S. at 846.

For all the foregoing reasons, summary judgment is therefore entered for Defendants on the substantive due process claim.

### D. Defendants Are Entitled to Summary Judgment on the Free Speech Claims

Plaintiffs allege that their terminations and suspension were retaliatory in nature. See Am. Compl. ¶ 3. Defendants, they claim, sought to punish them for speaking publicly about the longstanding technical and managerial problems at the PSCC and, in so doing, violated their rights under the First Amendment and the District of Columbia Whistleblower Protection Act ("WPA"). Id.; see also Pls.' Opp'n at 18-23. Defendants, however, argue that Plaintiffs' allegations are "unsupported by any evidence of causation" and consequently that they fail as a matter of law. District Defs.' Mot. at 25. A slightly different analysis governs each claim and the Court will therefore discuss them separately.

### 1. The First Amendment Claim

A public employee claiming retaliation in violation of the First Amendment must satisfy a four-prong test. O'Donnell v. Barry, 148 F.3d 1126, 1133 (D.C. Cir. 1998). She must show: first, that she was "speaking on a matter of public concern;" second, that her interest in speaking is not outweighed by the government's interest in "'promoting the efficiency of the public services it performs through its employees' without disruption;" third, that "her speech was a substantial or

motivating factor in prompting the retaliatory or punitive act of which she complains;" and fourth, that the employer would not have taken the same action if the protected conduct had not occurred.  Id. (internal citations and quotations omitted).  While the first two factors are questions of law, the latter two are generally questions of fact for the jury to decide.  Id.

Defendants contend, and the Court agrees, that this is the rare case where the third prong of the O'Donnell test can be decided as a matter of law.  Plaintiffs can only establish that their protected speech was a "substantial or motivating factor" in the adverse actions they suffered if they can demonstrate a causal link between the two.

There is no dispute that Chief Ramsey first announced his intention to fire Plaintiffs on March 6, 2003.  While Plaintiffs claim that Chief Ramsey made this statement "after he learned that [they] intended to speak out about what they knew to be a coverup" of problems at the PSCC, they can point to no evidence supporting that claim.  Am. Compl. ¶ 33. In fact, the first documented instance of protected speech occurred when Bibb, along with Anderson, spoke to Washington Post reporter David Farenthold in May 2003 — more than two months after Ramsey declared his intention to fire them and one month after Bibb received a Notice of Proposed Adverse Action from Cockett.  See David A. Farenthold, D.C. Hearing Officer Raises Questions About Fire Probe, Wash. Post, May 14, 2003 at B01.  The remaining Plaintiffs appear not to have spoken publicly until their July 31, 2003 press conference — nearly five months

after Ramsey's statement and four months after they received Notices of Proposed Adverse Action.[15]

In a different but persuasive context, the Supreme Court has made clear that a retaliation claim cannot proceed where the employer contemplated taking an adverse action before the employee engaged in a protected activity.   See Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 272 (2001).   In Breeden, a school district employee argued that she had been demoted in retaliation for filing a lawsuit alleging sexual harassment.   Id.   Her sole evidence of causation was temporal proximity: she filed her suit on April 1, 1997 and on April 10, 1997, her supervisor notified the union representative that he intended to demote her, an action that was not formalized until a later time.   Id.   While the Ninth Circuit found causation in this sequence of events, the Supreme Court reversed, noting that even though the case was filed on April 1, 1997, the supervisor did not learn of the suit until April 11, 1997, one day after announcing the demotion.   Id.

Because Breeden's supervisor could not have known about the protected activity at the time she initiated the adverse employment action, the Supreme Court found that there could be no causation even though the demotion did not take effect until after Breeden filed suit. "[E]mployers need not suspend previously planned [employment actions] upon learning that a . . . suit has been filed," the Court explained,

---

[15]   In his December 24, 2003, letter to Cockett, Adamson claimed that he had tried to make contact with the media. See Pls.' Ex. 74.  He does not describe when he made such efforts or whether they were successful.-

"and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence of causation." Here, as in Breeden, the employer decided on a course of action before it could possibly have known about the employees' protected activities. Consequently, here, as in Breeden, the employees cannot establish a causal link between the end result of that decision and the protected activities in which they engaged in the interim.

Without any evidence that Ramsey knew they intended to criticize him publicly and decided to retaliate on that basis, it is simply impossible for Plaintiffs to meet the third O'Donnell factor. Consequently, summary judgment must be entered in Defendants' favor on their First Amendment claim.

### 2. The WPA Claim

The WPA creates a cause of action for District of Columbia employees wrongfully disciplined for making "protected disclosures" about mismanagement, waste of public resources, abuse of authority, or other unlawful activity within the District government. See D.C. CODE § 1-615.51 et seq. To prevail under the statute, the employee must demonstrate: first, that she made a protected disclosure; and, second, that such a disclosure was a "contributing factor" in the employer's decision to take an adverse employment action. Id. § 1-615.54(b). The D.C. Court of Appeals has explained, moreover, that a plaintiff suing under the statute must also demonstrate that the employer would not have taken the adverse action for "legitimate" reasons independent of the

protected disclosure.   See Crawford v. District of Columbia, 891 A.2d 216, 219-221 (D.C. 2006).

The causation analysis in a WPA claim is therefore indistinguishable from the causation analysis in a First Amendment claim governed by O'Donnell.  In both cases, the plaintiff must show that she made a protected disclosure, that the disclosure was a substantial, motivating, or contributing factor in the employer's decision to discipline her, and that the employer would not have taken the action for other, legitimate reasons.  Because, for the reasons outlined above, Plaintiffs cannot establish causation on their First Amendment claim, they likewise cannot do so on their WPA claim.  There is simply no evidence from which a reasonable jury could find retaliation in violation of the WPA where Plaintiffs made their public statements after MPD already decided to terminate them.

Accordingly, summary judgment is entered for Defendants on the WPA claim.

**E.   Summary Judgment Is Not Appropriate on Plaintiffs' Section 1981 Claim**

Because they have offered a legitimate, non-discriminatory rationale for the adverse employment actions taken against Plaintiffs, Defendants argue that they are entitled to summary judgment on the Section 1981 claim.  See District Defs.' Mot. at 24-25.  Specifically, Defendants contend that Plaintiffs were terminated or suspended "because of the[ir] failure to respond to emergency calls on the morning of January 15, 2003."  Id. at 24.  Plaintiffs' counter, however, that they have propounded ample evidence suggesting that "Defendants' stated

reasons for terminating [them are] false" and that their Section 1981 claims should therefore proceed to trial.

Section 1981 guarantees, _inter alia_, that "all persons" shall have the "same right" to "make and enforce contracts" "as is enjoyed by white citizens." 42 U.S.C. § 1981. Specifically, it protects the "enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship," including the employment relationship, without regard to race. _Id._ The burden-shifting framework set forth in <u>McDonnell Douglas Corp. v. Green</u> governs claims alleging employment discrimination in violation of Section 1981. See <u>Murray v. Gilmore</u>, 406 F.3d 708, 713 (D.C. Cir. 2005); <u>see also</u> <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). Accordingly, the plaintiff must first make out a <u>prima facie</u> case by showing that: (1) she is a member of a class protected by federal anti-discrimination law; (2) she was qualified for the position in question;(3) she suffered an adverse employment action, including demotion or discharge; and (4) the position remained open or was filled by a white person." <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 506 (1993).

If the plaintiff succeeds, an inference of discrimination arises and the burden of production then shifts to the defendant to articulate a "legitimate non-discriminatory reason" for the adverse employment action. See <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 252 (1981). Should the defendant carry this burden, the inference of discrimination drops out of the case. The plaintiff must then be afforded an "opportunity to prove by a preponderance of the evidence

that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." <u>Reeves</u>, 530 U.S. at 143.   While the burden of production shifts back and forth, the plaintiff bears the burden of persuasion at all times.  See <u>McGill v. Muñoz</u>, 203 F.3d 843, 846 (D.C. Cir. 2000).

There appears to be no dispute that Plaintiffs, all of whom are African-American, have established a <u>prima facie</u> case.  Nor is their any dispute that Defendants have offered a legitimate non-discriminatory explanation for their actions.  The issue, then, is whether Plaintiffs are entitled to present evidence to a jury that Defendants' rationale is pretextual.

In support of their pretext arguments, Plaintiffs make three primary points.  First, they argue that a statistical analysis of adverse employment actions taken at MPD between 2000 and 2003 suggests significant racial disparities.[16]  <u>See</u> Pls.' Ex. 72.  While 63% of MPD officers are African-American and 29% are white, Plaintiffs' survey indicates that 80% of MPD disciplinary actions are taken against African-American officers compared to only 10% against white officers.[17] <u>See</u> Pls.' Opp'n at 89.  Consequently, Plaintiffs argue that "African-American officers are disciplined at a rate thirty-three percent (33%)

---

[16]  Surprisingly, Defendants' Reply brief does not challenge Plaintiffs' statistical evidence or otherwise address Plaintiffs' extensive pretext arguments.

[17]  Hispanic and Asian officers account for the remaining 10% of disciplinary actions.  <u>See</u> Pls.' Opp'n at 89.

higher than they should be [and] white officers are disciplined at a correspondingly lower rate." Id.

Second, Plaintiffs allege that since assuming her position as Assistant Chief, Defendant Cockett has routinely instituted harsher disciplinary sanctions against African-American officers than their white colleagues. Id. at 89-90. By their calculation, Cockett did not follow the recommendation of an Adverse Action Panel, but instead affirmed an earlier, harsher penalty, in twelve cases. Id. Eleven of those cases involved African-Americans and none involved a white officer. These figures, Plaintiffs argue, suggest that Cockett is more inclined to mete out severe discipline in cases involving African-American officers than she is in those involving whites, Asians, or Hispanics. Id. at 90.

Third, and finally, Plaintiffs point out that while they suffered severe penalties in the wake of January 15, 2003, the lone white call taker on duty that night faced no disciplinary charges whatsoever. Id. at 92. This fact, they contend, suggests that Defendants' facially non-discriminatory rationale in fact "hid[es] discriminatory motives." Id. at 91.

The evidence Plaintiffs have proffered is sufficient to allow their Section 1981 claims to proceed. At the pretext stage, the plaintiff's burden is simply to offer evidence calling into question the truthfulness of the employer's stated rationale. See Brown v. Brody, 199 F.3d 446, 459 (D.C. Cir. 1999). So long as a reasonable jury could find in plaintiff's favor, the discrimination claim must go forward.

See <u>Laningham</u>, 813 F.2d at 1242.   Here, Plaintiffs have offered specific, and at least preliminarily credible, evidence that African-American MPD officers have been disciplined more frequently, and more severely, than their white counterparts.   Further, they have demonstrated that it is at least plausible that race played a role in the decision to discipline them for the events of January 15, 2003. Defendants, meanwhile, have failed even to answer Plaintiffs' charges, let alone explain why they should fail as a matter of law.

On these facts, a reasonable jury could find in Plaintiffs' favor. Consequently, summary judgment is denied on the Section 1981 claim.

## IV.   CONCLUSION

For the foregoing reasons, Defendant Grossman's Motion is **granted** and the District Defendants' Motion is **granted in part and denied in part**.

An Order will issue with this Memorandum Opinion.


April 19, 2006                         $\underline{\text{/s/}\hspace{3cm}}$
                                       Gladys Kessler
                                       U.S. District Judge


<u>**Copies to**</u>: **Attorneys of record via ECF**